UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COURTNEY LYNNE MEDINA,

          Plaintiff,              CIVIL ACTION NO. 11-15272

       v.                     DISTRICT JUDGE SEAN F. COX

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

          Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 9 and 11)

**I.    PROCEDURAL HISTORY**

    *A.    Proceedings in this Court*

    On December 1, 2011, Plaintiff filed suit seeking judicial review of the Commissioner's

decision to deny benefits.  (Dkt. No. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.1(b)(3), the case was referred to this Magistrate Judge to review the Commissioner's decision.

(Dkt. No. 3).  Before the Court are cross-motions for summary judgment.  (Dkt. Nos. 9, 11).

Plaintiff also filed a Reply.  (Dkt. No. 12).

    *B.    Administrative Proceedings*

    Plaintiff applied for disability and disability insurance benefits on August 14, 2009,

alleging a disability onset date of September 1, 2005.  The application was initially denied by the

Commissioner on December 4, 2009.  (Tr. 12).  On February 9, 2011, Plaintiff appeared with

counsel for a video hearing before Administrative Law Judge ("ALJ") Troy M. Patterson, who

considered the case *de novo*.  At the hearing, Plaintiff amended her alleged onset disability date

to August 14, 2009, the date of her application. (Tr. 12). On March 18, 2011, the ALJ found that Plaintiff was not disabled. (Tr. 9-28). Plaintiff requested a review of this decision. (Tr. 7-8). On November 4, 2011, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for further review. (Tr. 1-3).

In light of the entire record in this case, this Magistrate Judge finds that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and that the case be **REMANDED** to the Commissioner for further proceedings.

## II. STATEMENT OF FACTS

### A. *ALJ Findings*

Plaintiff was born on January 23, 1992 and was in the "adolescents" age group when the application was filed in 2009. (Tr. 16). Plaintiff turned 18 on January 23, 2010. (Tr. 16).

#### 1. Child Disability Standard

The ALJ applied a three-step sequential evaluation process to determine whether Plaintiff was disabled between August 14, 2009 and her 18th birthday on January 23, 2010. (Tr. 12).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity. (Tr. 16).

At step two, the ALJ found that Plaintiff had the following "severe" impairments before she reached the age of 18: borderline personality disorder, major depressive disorder, mood disorder, oppositional defiant disorder, bipolar disorder, and posttraumatic stress disorder ("PTSD"). (Tr. 17).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listings in the regulations. (Tr. 17).

The ALJ next determined the degree of limitation in each of six functional domains, and found that Plaintiff did not have an impairment or combination of impairments that functionally equaled any of the listings. The ALJ's specific findings as to the six functional domains were: Acquiring and Using Information (Plaintiff had no limitation); Attending and Completing Tasks (Plaintiff had less than marked limitation); Interacting and Relating with Others (Plaintiff had less than marked limitation); Moving About and Manipulating Objects (Plaintiff had no limitation); Caring for Yourself (Plaintiff had less than marked limitation); and Health and Physical Well-Being (Plaintiff had less than marked limitation). (Tr. 18-25).

### 2.   Adult Disability Standard

In analyzing Plaintiff's claim after she attained the age of 18 on January 23, 2010, the ALJ applied the five-step disability analysis and found at step one that Plaintiff had not engaged in substantial gainful activity. (Tr. 16).

At step two, the ALJ found Plaintiff continued to have the same "severe" impairments of: borderline personality disorder, major depressive disorder, mood disorder, oppositional defiant disorder, bipolar disorder, and PTSD. (Tr. 25).

At step three, the ALJ found no evidence that Plaintiff had an impairment or combination of impairments that met or medically equaled one of the listed impairments in the regulations. (Tr. 25)

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform "a full range of work at all exertional levels but with the following nonexertional limitations: she is restricted to jobs that involve only superficial or incidental

-3-

interpersonal contact with co-workers and the public, and should avoid jobs that require

production rate pace work." (Tr. 25).

At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 26).

At step five, the ALJ denied Plaintiff benefits, because he found that Plaintiff could

perform a significant number of jobs available in the national economy, such as assembler

(60,000 jobs in the national economy), packer (200,000 jobs in the national economy), and

inspector (80,000 jobs in the national economy). (Tr. 27).

        **B.**    *Administrative Record*

        **1.**    **Plaintiff's Testimony & Statements**

Plaintiff testified at the administrative hearing that she does not have a driver's license

because her nerves interfere with her ability to drive. (Tr. 42). Plaintiff also had difficulty

graduating from high school because she was scared of people. In class, she would become

nervous, sweat, and her heart would beat fast. Plaintiff testified that she has daily panic attacks

that cause her head to spin, and cause her to stop breathing, shake, sweat, and feel like she could

fall over. (Tr. 43). In the past, she would cut herself a few times per week when she had panic

attacks, but discontinued that behavior. (Tr. 44).

Plaintiff was hospitalized twice for suicide attempts. (Tr. 43-44). To help with her

suicidal thoughts, Plaintiff takes medication and talks to either her mother or her doctor. (Tr.

44). Plaintiff believes her medication causes her to sleep. (Tr. 46). According to Plaintiff, it is

difficult to function when she is on her medication. (Tr. 46). Plaintiff gets dry mouth, brittle

hair, poor eyesight, tremors, constipation, and becomes extremely thirsty as a result of her

medication. (Tr. 48).

-4-

Plaintiff rarely leaves the house without her mother.  (Tr. 43).  When she does leave the house, it is only on Sundays for church and sometimes on Saturdays for a few hours.  (Tr. 46).  Plaintiff thinks people are trying to harm her.  (Tr. 46).  At home, Plaintiff leaves her shower curtain open in case somebody tries to attack her, and she is scared to pass her mother's room because she thinks somebody is in the window.  (Tr. 45).

Plaintiff testified that her typical day consists of sleeping approximately seven hours during the day, watching court TV, playing on the computer, or playing with her cat.  (Tr. 46).  She thinks someone is going to break in and kill her, but she talks herself out of it.  (Tr. 46).  The doors have to be open in the house; if a door is closed, she will not walk by it.  (Tr. 46).  When she is in the car at night, she thinks she sees somebody in the street, or that a pile of trash is a person in the road.  (Tr. 45).  Plaintiff testified that she cannot multitask.  (Tr. 45).

Plaintiff wears the same sweat suit for 3-4 days in a row, because she does not like getting dressed.  Plaintiff does not shower as much as she should, and she does not comb her hair unless she has to.  (Tr. 45).  Plaintiff can fold clothes and wash dishes.  (Tr. 47).

Plaintiff worked in elder care and did stock at RGIS[1], but the people scared her; she thought she was going to die, her chest got tight, she was sweaty, and it was hard to focus.  (Tr. 48).

## 2.   Medical Evidence

On January 19, 2009, Plaintiff was referred to the emergency room at St. Mary's of Michigan by her therapist because she was suicidal.  (Tr. 218).  Plaintiff reported that she had been considering suicide daily for approximately one month, and her mother indicated that

---

[1] "RGIS is the market leader in supply chain, inventory, insights, merchandising and optimization solutions."  http://www.regis.com/us_en (last visited September 10, 2012).

Plaintiff became confrontational with authority and had been suspended from school.  (Tr. 219).

Plaintiff stated that she was hospitalized in 2006 for suicidal ideation; she has not felt suicidal

since then.  (Tr. 311).  At the time of her hospitalization, Plaintiff did not have a history of

suicide attempts.  (Tr. 311).  Plaintiff had a flat affect, but there was no evidence of auditory or

visual hallucinations.  (Tr. 312).

Plaintiff was admitted to White Pine Psychiatric Hospital at Healthsource Saginaw

("White Pine") for inpatient psychiatric treatment on January 20, 2009.  (Tr. 220, 240).  Plaintiff

reported that she was "doing fairly good up until recently, but . . . started feeling down for the last

couple of weeks and started having suicidal ideation."  (Tr. 243).  Plaintiff also reported low

energy, and had difficulty concentrating.  (Tr. 243).  She denied auditory or visual hallucinations,

but admitted to easily becoming frustrated and to being more irritable than usual.  (Tr. 243-244).

Dr. Venkat Talasila performed a psychiatric evaluation in which he noted Plaintiff had a flat

affect, depressed mood, and feelings of helplessness and hopelessness.  Plaintiff was diagnosed

with bipolar disorder and oppositional defiant disorder; her GAF[2] score was 20.  (Tr. 243-245).

When Plaintiff was discharged from White Pine on January 23, 2009, Dr. Talasila noted

that when she was admitted, Plaintiff was placed on suicide and assaultive precautions for safety

reasons; she was placed on self-abuse precautions due to self-inflicted lacerations on her right

---

[2]The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).  "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 fn. 7 (6th Cir. 2006).

forearm. (Tr. 240-241). Dr. Talasila indicated that Plaintiff showed a gradual but good response in her mood and interaction with therapeutic intervention, medication, and structured environment. (Tr. 240). Upon discharge, Plaintiff did not voice any suicidal or homicidal ideation; her GAF score was 40. (Tr. 240-241). Plaintiff was to follow-up with individual counseling on February 2, 2009. (Tr. 240). Her diagnoses were the same as when she arrived at White Pine. (Tr. 241).

On February 17, 2009, Plaintiff informed Dr. Madhumalti Bhavsar that she had suffered from depression "off and on" for three years. (Tr. 213). She stated that her depressive phase lasts for one month, during which she feels sad, isolates herself, cries a lot, and does not feel like doing anything. (Tr. 213). After a month, Plaintiff would get more irritable and scream and yell at others for approximately two weeks. (Tr. 213). Plaintiff explained that she used to cut her wrists when depressed, but has not done that for three years. (Tr. 213). Dr. Bhavsar performed a psychiatric evaluation on Plaintiff and noted Plaintiff had decreased energy, impaired concentration, previous suicidal attempts, and racing thoughts. (Tr. 213). Plaintiff's mood was euthymic, her affect was appropriate, and her concentration was poor. (Tr. 214). Plaintiff was diagnosed with Bipolar Mood Disorder, and had a GAF score of 48. (Tr. 214). Dr. Bhavsar indicated that Plaintiff needed counseling. (Tr. 215).

On March 12, 2009, Dr. Bhavsar indicated that Plaintiff was doing well, and her mood swings were under control. Plaintiff did not have any side effects from her medication, and she denied suicidal or homicidal thoughts and plans. Her GAF score was 50. (Tr. 212).

On April 30, 2009, Plaintiff had her medication reviewed at Bay Psychological Associates. Dr. Bhavsar indicated that Plaintiff was doing well; her depression and mood swings were under control. Plaintiff did not have suicidal or homicidal thoughts. Dr. Bhavsar diagnosed

Plaintiff with Bipolar Mood Disorder, and stated she needed therapy. Plaintiff had a GAF score of 54. (Tr. 211).

Plaintiff was admitted to White Pine again on May 15, 2009. Upon admission, Plaintiff reported that she was in school the previous day and thought of killing herself by drug overdose. (Tr. 231). She reported not feeling connected to the world: people were treating her differently and not accepting her; she did not like her school or teacher. (Tr. 231). Plaintiff acknowledged fleeting thoughts of suicide (Tr. 231), shifting between good moods and bad moods and experiencing anxiety and symptoms similar to panic attacks. (Tr. 232). Plaintiff showed continued suicidality with an urge to cut herself. She showed poor progress even with intensive therapeutic interventions. (Tr. 228). Plaintiff reported being unsocial with very few friends, having no energy, no motivation, and nightmares about past molestation by her father. (Tr. 231-232). She was placed on one-on-one close observation by the staff for safety issues until May 31, 2009, and was then required to stay near the nursing station for close observation. (Tr. 228). Plaintiff showed poor progress and continued to state that she felt suicidal and had no hope. (Tr. 229). Upon examination, Plaintiff had no elements of hallucinations or suicidal ideation, and her attention and concentration were fair; her GAF score was 20. (Tr. 233-234).

On June 2, 2009, Plaintiff's treating psychiatrist, Dr. K.J. Raval, examined Plaintiff at White Pine due to symptoms of resistant depression. (Tr. 235). Dr. Raval noted that Plaintiff has a longstanding history of resistant depression, self-abusive behaviors, suicidal ideations, and recent homicidal ideation. (Tr. 235). Plaintiff reported that she was hospitalized in 2006 for acute suicidal ideations. (Tr. 235). When severely depressed, Plaintiff said she hears voices telling her to kill herself. (Tr. 236). Even with her medication, Plaintiff says she is anhedonic; she feels hopeless, helpless, worthless; and she wants to end her life. (Tr. 236). Plaintiff gets

homicidal thoughts where she wants to go on a shooting spree. (Tr. 236). On examination, Dr. Raval noted Plaintiff had "a lot" of anhedonia, feelings of helplessness and hopelessness, anger and frustration, active suicidal ideations, a sad affect, depressed mood, active urges to self-abuse, and fleeting homicidal thoughts. (Tr. 237). Her GAF score was 30, and Dr. Raval recommended long-term hospitalization. (Tr. 238).

On June 10, 2009, Plaintiff was discharged from White Pine. Dr. Venkat Talasila recommended long-term hospitalization upon discharge, and she was transferred to the Hawthorn Center for continued treatment. Her GAF score was 30. (Tr. 229). Upon admission to the Hawthorn Center, Plaintiff's affect was blunted, and her mood was sad. (Tr. 246). Plaintiff reported that she had no homicidal ideation or plans, but she made comments that reflected her thoughts of dying and harming herself. (Tr. 246). When she was discharged on July 2, 2009, Plaintiff was "doing well" and denied hallucinations and suicidal or homicidal plans; her GAF score was 48. (Tr. 248). Her diagnoses upon discharge were major depressive disorder and PTSD. (Tr. 248).

On July 15, 2009, Carey Moffett, a social worker, performed an intake evaluation of Plaintiff at Saginaw County Community Mental Health Authority. (Tr. 262). Plaintiff reported that her depressive symptoms significantly increased in the last six months. (Tr. 265). Ms. Moffett indicated that Plaintiff attempted suicide recently, but Plaintiff denied any current thoughts of wanting to harm herself. (Tr. 265). Plaintiff was diagnosed with major depressive disorder, and had a GAF score of 55. (Tr. 271).

On July 28, 2009, Dr. G. Renee Thomas-Clark reported that Plaintiff was very distressed that she could not enter the military due to her mental health issues. (Tr. 254). However, Plaintiff had less racing thoughts, could stay awake longer, had less mood swings, and was less

depressed due to her medication.  (Tr. 252).  Plaintiff heard voices telling her to kill herself in the past, but she no longer heard those voices.  (Tr. 252).  She admitted to occasional suicidal thoughts, but had no plan to commit suicide.  (Tr. 252).  She said that when she cuts herself, it is not a suicide attempt.  (Tr. 252).  Dr. Clark provided a GAF score of 40.  (Tr. 251).

A Childhood Disability Evaluation Form was completed on August 14, 2009; Plaintiff's ability to care for herself was "less than marked."  (Tr. 363).

On September 3, 2009, Plaintiff reported to counselor Kathleen McFarland that she continued to have thoughts of wanting to cut herself; she felt depressed and overwhelmed about getting through her senior year of high school.  (Tr. 357).

On September 27, 2009, Plaintiff was assessed by Lori Denter who noted that Plaintiff had cuts on her right thigh.  (Tr. 348).  Ms. Denter provided a GAF score of 40, and Plaintiff's mother indicated that she had all of the medication and knives in her house put away so Plaintiff could not harm herself.  (Tr. 350).

On September 28, 2009, counselor McFarland reported that Plaintiff cut herself, and she was angry about not being hospitalized.  Plaintiff stated she wished she could live in the hospital because she felt safe there.  (Tr. 354).

On October 31, 2009, Plaintiff's teacher, Cynthia Schneider, completed a questionnaire for the state DDS.  She noted that she taught Plaintiff American Literature, AP United States History, and AP United States Government.  (Tr. 167).  Ms. Schneider opined that Plaintiff had no problem acquiring and using information, or moving about and manipulating objects.  (Tr. 168, 171).  She did have problems interacting and relating with others, and caring for herself.  (Tr. 170, 172).

-10-

On December 4, 2009, Dr. Ron Marshall examined Plaintiff's medical records and wrote a report for the state DDS.  Dr. Marshall opined that Plaintiff had: (1) no limitation in acquiring and using information; (2) less than marked limitation in attending and completing tasks; (3) less than marked limitation in interacting and relating with others; and (4) less than marked limitation in caring for herself.  (Tr. 362-363).

On April 1, 2010, Dr. Raval reported that Plaintiff had a longstanding history of PTSD, mood disorder, and depression.  (Tr. 370).  Plaintiff's symptoms included depressed mood, panic attacks, nightmares, minor mood shifts, hallucinations that have subsided, and chronic muscular pain.  (Tr. 370).  Plaintiff was diagnosed with Bipolar I disorder, and mixed and chronic PTSD. (Tr. 371).  Her GAF score was 69.  (Tr. 371).

On June 17, 2010, Dr. Raval reported that Plaintiff was feeling anxious, but that she no longer hears voices.  (Tr. 372).  She did report "seeing people at times" and was experiencing significant paranoia.  (Tr. 372).

On August 19, 2010, Plaintiff reported to Dr. Raval that she was having visual hallucinations and paranoia.  She no longer had frequent nightmares.  (Tr. 373).

On September 16, 2010, Dr. Raval wrote a prescription that said Plaintiff was significantly ill and would not be able to work until she felt better.  (Tr. 374).

On November 15, 2010, Dr. Raval reported that Plaintiff continued to have visual hallucinations, and was seeing shadows.  (Tr. 375).  Plaintiff reported being lethargic during the day, paranoid, and depressed.  (Tr. 375).

On January 6, 2011, Dr. Raval completed a RFC assessment in which he opined that Plaintiff was markedly limited in her ability to:

(1)      remember locations and work-like procedures;

-11-

(2)     understand and remember very short and simple instructions;

(3)     understand and remember detailed instructions;

(4)     carry out detailed instructions;

(5)     maintain attention and concentration for extended periods;

(6)     perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

(7)     sustain an ordinary routine without special supervision;

(8)     work in coordination with or proximity to others without being distracted by them;

(9)     complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods;

(10)    accept instructions and respond appropriately to criticism from supervisors;

and

(11)    get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

(Tr. 376-378).

### 3.    Vocational Expert

During the hearing, the ALJ asked a vocational expert ("VE") to assume a hypothetical individual who is Plaintiff's age, has Plaintiff's level of education, and past work experience who has a RFC for work at all exertional levels but because of a mental impairment would need to restrict her work to jobs that involve only superficial and incidental interpersonal contact with co-workers and the public and should avoid jobs that require production rate pace work. (Tr. 48-49). The VE testified that jobs existed in the national economy for an individual with those limitations. (Tr. 49). In the light classification, such an individual could perform work as an

assembler (60,000 jobs available), packer (200,000 available jobs), or inspector (80,000 available jobs). (Tr. 49).

However, the VE testified that the hypothetical individual would be precluded from work if the individual: (1) would be off task 25 percent more often than an unimpaired individual during the workday; (2) was required to be absent from work one day per week; and (3) could not be in the same room with other people. (Tr. 49-50).

### C.      Plaintiff's Claims of Error

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record and is contrary to the Social Security Act. Specifically, Plaintiff argues that the ALJ committed reversible legal error when he: (1) evaluated the fifth domain of caring for yourself on the child disability portion of her claim; and (2) failed to give controlling weight to Plaintiff's treating psychiatrist, Dr. Raval. (Dkt. 9; Pl.'s Br. at 1).

## III.      DISCUSSION

### A.      Standard of Review

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

-13-

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility") (internal quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely

-14-

because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen*, 800 F.2d at 545).

The scope of this Court's review is limited to an examination of the record only.  *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

**B.      Governing Law**

The "[c]laimant bears the burden of proving [her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 CFR § 416.905(a) (SSI).

**1.      Adult Disability Standard**

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 CFR §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [s]he is precluded from performing [her] past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [her] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 CFR §§ 416.920(a)(4)(v) and (g).

## 2.      Child Disability Standard

Although the standard of review of the Commissioner's decision is the same as for adults, children's disability claims are reviewed under criteria different from adults.  There is no five step evaluation, but pursuant to the 1996 enactment of the Personal Responsibility and Work

Opportunity Reconciliation Act, which changed the definition of disability for children seeking Social Security benefits, *see* 42 U.S.C. § 1382c(a)(3)(c), there is a three step sequential process in determining whether a child is "disabled."  First, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must meet, medically equal or functionally equal one of the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. § 416.924.  In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing.  *See* 20 C.F.R. § 416.924(a); *Hale v. Sec'y of Health & Human Servs*., 816 F.2d 1078, 1083 (6th Cir.1987).  It is insufficient that a claimant comes close to meeting the requirements of a listed impairment.  *See Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986).

Under section 416.926a, if a child's impairment or combination of impairments does not meet or is not medically equivalent in severity to a listed impairment, then the Commissioner will assess all functional limitations caused by the impairment to determine if the child's impairments are *functionally equivalent in severity to any of the listed impairments* of Appendix 1. (20 C.F.R. § 404, subpt. P, app. 1) (emphasis added).  The following areas of development (referred to as "domains") are considered in determining whether a child's impairments are functionally equivalent to a listed impairment: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well Being.  *See* 20 C.F.R. § 416.926a.  A finding of functional equivalence to a listed impairment is warranted when the child has an extreme limitation in one domain of functioning or marked limitations in two domains of functioning.  *See* 20 C.F.R § 416.926a(d).

C.      *Analysis and Conclusions*

      1.      **The ALJ Did Not Err in Assessing the Fifth Functional Domain (Caring for Yourself)**

To establish a disability under the standards for SSI child's benefits, Plaintiff must show that her impairment resulted in "marked" limitations in two functional domains or an "extreme" limitation in one domain. 20 CFR § 416.926a(a). The ALJ found that Plaintiff suffered from "less than marked" limitation in her ability to care for herself, and Plaintiff argues that this finding is not supported by substantial evidence. According to Plaintiff, she had an "extreme" limitation in the caring for yourself domain; therefore, she was disabled under the child disability standard.

The regulations state the following with regard to the caring for yourself domain:

In this domain, we consider how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area.

(1) *General*. (i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.

      (ii)      Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

      (iii)      Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and

of your physical and emotional needs.  To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions.  Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv)   Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

(2)   *Age group descriptors . . . (v) Adolescents (age 12 to attainment of age 18)*.  You should feel more independent from others and should be increasingly independent in all of your day-to-day activities.  You may sometimes experience confusion in the way you feel about yourself.  You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body.  Sometimes these worries can make you feel angry or frustrated.  You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down).  You should begin to think seriously about your future plans, and what you will do when you finish school.

(3)   *Examples of limited functioning in caring for yourself*.  The following examples describe some limitations we may consider in this domain.  Your limitations may be different from the ones listed here.  Also, the examples do not necessarily describe a "marked" or "extreme" limitation.  Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one.  As in any case, your limitations must result from your medically determinable impairment(s).  However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) result in a "marked" or "extreme" limitation in this domain.

.    .    .

(iv)   You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.

.     .     .

(vi)    You have disturbance in eating or sleeping patterns.

20 CFR § 416.926a(k).  The regulations provide:

> We will find that you have an "extreme" limitation in a domain when your
> impairment(s) interferes very seriously with your ability to independently initiate,
> sustain, or complete activities.  Your day-to-day functioning may be very seriously
> limited when your impairment(s) limits only one activity or when the interactive
> and cumulative effects of your impairment(s) limit several activities.  "Extreme"
> limitation also means a limitation that is "more than marked."  "Extreme"
> limitation is the rating we give to the worst limitations.  However, "extreme
> limitation" does not necessarily mean a total lack or loss of ability to function.  It
> is the equivalent of the functioning we would expect to find on standardized
> testing with scores that are at least three standard deviations below the mean.

20 CFR § 416.926a(e)(3)(i).  Plaintiff argues that this definition of an "extreme" limitation is not

specific and urges the Court to follow the example provided in the sixth domain of health and

physical well-being:

> For the sixth domain of functioning, "Health and physical well-being," we may . . .
> consider you to have a "marked" limitation if you are frequently ill because of your
> impairment(s) or have frequent exacerbations of this domain, "frequent["] means
> that you have episodes of illness or exacerbations that occur on an average of 3
> times a year, or once every 4 months, each lasting 2 weeks or more.  We may also
> find that you have a "marked" limitation if you have episodes that occur more often
> than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur
> less often than an average of 3 times a year or once every 4 months but last longer
> than 2 weeks, if the overall effect (based on the length of the episode(s) or its
> frequency) is equivalent in severity.
>
> For the sixth domain of functioning, "Health and physical well-being," we may . . .
> consider you to have an "extreme" limitation if you are frequently ill because of
> your impairment(s) or have frequent exacerbations of your impairment(s) that result
> in significant, documented symptoms or signs substantially in excess of the
> requirements for showing a "marked" limitation[.]

20 CFR §§ 416.926a(e)(2)(iv) and 416.926a(e)(3)(iv).  Using this example, Plaintiff says she

would have a "marked" limitation if she had an illness three times per year for two weeks or

more (a total of 42 days), and she would have an "extreme" limitation if her illness lasted

-21-

substantially in excess of 42 days per year.  According to Plaintiff, she has an "extreme" limitation in the caring for yourself domain, because she was hospitalized for 54 days.  This Magistrate Judge disagrees.  Even assuming Plaintiff's analysis is correct, the example *only* applies to the sixth domain – health and physical well-being; it does not apply to any other domain.

Plaintiff also argues that the ALJ should have considered her multitude of GAF scores that were at or below 50 over a considerable period of time, and she says his failure to do so constitutes reversible legal error.  This Magistrate Judge finds GAF scores are of limited significance in disability cases.  *See Kornecky*, 167 F. Appx at 511 (holding that there is no controlling authority requiring the ALJ to put stock in a GAF score) (citations omitted).  A GAF score merely represents the clinician's judgment as to the individual's overall level of functioning.  *See DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 416 (6th Cir. 2006). "[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning." *Kornecky*, 167 F. Appx at 511.  Thus, failure to reference a GAF score, by itself, is not sufficient ground to reverse a disability determination.  *See DeBoard*, 211 F. App'x at 416.  Moreover, the Sixth Circuit has affirmed denials of disability benefits for individuals with GAF scores lower than 50. *See id.*

In addition, Plaintiff only cites one GAF score that was less than 50 after her amended disability date of August 14, 2009; the other GAF scores that Plaintiff cites were provided before August 14, 2009.  Even if this Magistrate Judge took into account Plaintiff's GAF scores before August 14, 2009, Plaintiff fails to acknowledge the fact that her GAF scores fluctuated – they were not always below 50.  For example, in March 2009, her GAF score was 50 (Tr. 212); in

April 2009, her GAF score was 54 (Tr. 211); and in July 2009, her GAF score was 55.  (Tr. 271).

Plaintiff fails to show that the ALJ erred in not finding that she had an extreme limitation in the

caring for herself domain, based solely on her GAF scores.

    In order to determine if Plaintiff had an "extreme" limitation in the caring for yourself

domain, the ALJ was required to review the overall case record and determine whether Plaintiff's

impairments – including her suicidal thoughts and self-harm – very seriously interfered with her

ability to independently initiate, sustain, or complete activities.  *See* 20 CFR § 416.926a(e)(3)(I).

After review of the ALJ's decision, the Court finds he complied with this requirement, and

substantial evidence supports the ALJ's decision that Plaintiff did not have an "extreme"

limitation in the Caring for Yourself domain.

### 2.    Substantial Evidence Does Not Support the ALJ's Finding that Plaintiff's Treating Psychiatrist's Opinion (Dr. Raval) is Not Entitled to Controlling Weight

    Plaintiff next argues that the ALJ erred by not giving controlling weight to her treating

physician's opinion (Dr. Raval).  According to Plaintiff, Dr. Raval's opinion is consistent with

the overall record, and is entitled to controlling weight.

    Under the treating source rule, "[a]n ALJ must give the opinion of a treating source

controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and

laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in

[the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting

20 CFR § 404.1527(d)(2)); *see also* SSR 96–2p.  Furthermore, even where the ALJ finds that a

treating physician's opinion is not entitled to controlling weight, he or she must apply the

following non-exhaustive list of factors to determine how much weight to give the opinion: (1)

"the length of the treatment relationship and the frequency of examination," (2) "the nature and

2:11-cv-15272-SFC-MAR   Doc # 14   Filed 09/13/12   Pg 24 of 27   Pg ID 492

extent of the treatment relationship," (3) the relevant evidence presented by a treating physician

to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the

specialization of the treating source." *Id.*; 20 CFR § 404.1527.

The treating-source rule also "contains a clear procedural requirement." *Wilson*, 378 F.3d

at 544 (citing 20 CFR § 404.1527(d)). In particular, "the [ALJ's] decision must contain specific

reasons for the weight given to the treating source's medical opinion, supported by the evidence

in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight." SSR 96–2p, 1996 WL 374188 at *5; *Rogers*, 486 F.3d at 242. "[A] failure to follow

the procedural requirement of identifying the reasons for discounting the opinions and for

explaining precisely how those reasons affected the weight accorded the opinions denotes a lack

of substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record." *Rogers*, 486 F.3d at 243; *see also Wilson*, 378 F.3d at 544 ("[t]he regulation requires the

agency to "give good reasons" for not giving weight to a treating physician in the context of a

disability determination") (citation omitted).

On the other hand, the issue of whether Plaintiff is disabled within the meaning of the

Social Security Act is reserved to the Commissioner. *See* 20 CFR § 404.1527(e); *see also*

*Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *Gaskin v. Comm'r of Soc.*

*Sec.*, 280 F.Appx. 472, 474 (6th Cir. 2008). The ALJ "is not bound by conclusory statements of

doctors, particularly where they are unsupported by detailed objective criteria and

documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *see also Kidd v. Comm'r of*

*Soc. Sec.*, 283 F.Appx. 336, 340 (6th Cir. 2008). An opinion that is based on Plaintiff's reporting

of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health &*

-24-

*Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Smith v. Comm'r of Soc. Sec.*, 482

F.3d 873, 876-77 (6th Cir. 2007).

>The ALJ stated the following regarding Dr. Rival's opinion:

>K.J. Raval, M.D., a treating psychiatrist, evaluated [Plaintiff] on April 1, 2010.
>He noted that her symptoms included depressed mood, nightmare, mood shifts,
>panic attacks, hallucinations, and chronic pain.  He diagnosed bipolar I disorder
>and chronic PTSD.  In a treatment note dated June 17, 2010, Dr. Raval noted that
>no side effects were reported, no suicidal ideations were noted, no homicidal
>ideations were noted, and no psychotic symptoms were noted.  Dr. Raval reported
>on August 19, 2010 that [Plaintiff] was occasionally having visual hallucinations
>and that she was at times paranoid.  Nevertheless, he indicated that no side effects
>were reported, no suicidal ideations were noted, no homicidal ideations were
>noted, and no psychotic symptoms were noted.  Dr. Raval opined on September
>16, 2010 that [Plaintiff] was significantly ill and therefore she would not be able
>to work until she felt better.

>On November 15, 2010, Dr. Raval noted that [Plaintiff] complained of seeing
>shadows.  In addition, he noted that she was lethargic during the daytime.
>Moreover, she was paranoid and felt depressed.  He increased her Risperdal
>dosage and noted that her psychotic symptoms included visual hallucinations.
>However, he indicated that no side effects were reported, no suicidal ideations
>were noted, and no homicidal ideations were noted.

>Dr. Raval completed a medical source statement dated January 6, 2011.  He noted
>a diagnosis of bipolar I disorder - mixed with psychosis.  He opined that
>[Plaintiff] had markedly limited abilities in the areas of carrying out detailed
>instructions; maintaining attention and concentration for extended periods; and
>performing activities within a schedule, maintaining regular attendance, and being
>punctual within customary tolerances.  In addition, he opined that [Plaintiff] had
>markedly limited abilities in sustaining an ordinary routine without special
>supervision; working in coordination with or proximity to others without being
>distracted by them; and completing a normal workday and work week without
>interruption from psychologically based symptoms, and performing at a consistent
>pace without an unreasonable number and length of rest periods.  He also opined
>that [Plaintiff] has markedly limited abilities in accepting instructions and
>responding appropriately to criticism from supervisors; and getting along with co-
>workers or peers without distracting them or exhibiting behavioral extremes.
>Moreover, he opined that [Plaintiff] has markedly limited abilities in remembering
>locations and work-like procedures; and understanding and remembering very
>short and simple instructions.  The undersigned does not assign controlling weight
>to Dr. Raval's assessment since his noted limitations are not consistent with the
>overall record.

(Tr. 25-26). Plaintiff argues that the ALJ's conclusion that Dr. Raval's January 2011 assessment is not consistent with the overall record is incorrect. According to Plaintiff, Dr. Raval's limitations are consistent with Dr. Raval's own office notes as well as the findings and opinions of Plaintiff's prior examining physicians.

This Magistrate Judge finds the ALJ violated § 1527(d)(2) by failing to give good reasons for his rejection of Dr. Raval's opinion. According to Plaintiff's medical records, Dr. Raval treated Plaintiff from at least June 2009 through January 2011. Plaintiff submitted Dr. Raval's opinion to the ALJ. Dr. Raval's opinion identified greater restrictions on Plaintiff's ability to work than those ultimately found by the ALJ.

The ALJ's summary dismissal of Dr. Raval's opinion fails to meet the requirement that the ALJ "give good reasons" for not giving controlling weight to the treating source. It is uncontested that Dr. Raval was Plaintiff's treating psychiatrist, and Dr. Raval treated Plaintiff during the period that she alleged she was disabled. To simply state that Dr. Raval's limitations are "not consistent with the overall record" hardly amounts to "giving good reasons" for rejecting Dr. Raval's opinion.

## IV.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and that case be **REMANDED** to the Commissioner for further proceedings. On remand, the ALJ must: (1) apply the four factors outlined in 20 CFR § 404.1527; (2) indicate with sufficient specificity the weight he gave Dr. Raval's opinion; and (3) indicate with sufficient specificity the reasons for that weight.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon_____
Mark A. Randon
United States Magistrate Judge

Dated: September 13, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, September 13, 2012, by electronic and/or ordinary mail.*

s/Melody R. Miles_____
*Case Manager to Magistrate Judge Mark A. Randon*
(313) 234-5540
